AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of New Jersey

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Patrick Giblin | ) | Case No. |
| | ) | 16-1017 (AMD) |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  December 2012 to December 2014  in the county of  Atlantic  in the  District of  New Jersey , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1343 | Wire Fraud (See Attachment A) |

This criminal complaint is based on these facts:

See Attachment B (Affidavit)

☑ Continued on the attached sheet.

*Complainant's signature*

Mark Hindle, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  08/17/2016

*Judge's signature*

City and state:   Camden, New Jersey     Honorable Ann Marie Donio, U.S. Magistrate Judge
*Printed name and title*

CONTENTS APPROVED

UNITED STATES ATTORNEY

By: _____
Matthew J. Skahill, AUSA

By: _____
Gabriel J. Vidoni, AUSA

August 17, 2016

**Attachment A**

From in or about December 2012 through on or about December 16, 2014, in Atlantic County, in the District of New Jersey, and elsewhere, defendant

PATRICK GIBLIN

did knowing and intentionally devise and intend to devise a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations, and promises, as described in the attached Affidavit, and, for the purpose executing the aforesaid scheme and artifice, did knowingly transmit and caused to be transmitted by means of wire in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, as set forth in the attached Affidavit, including but not limited to causing Victim #1 to send on January 14, 2013 an interstate wire transfer of approximately $300 from Boonton, New Jersey to Philadelphia, Pennsylvania.

In violation of Title 18, United States Code, Section 1343.

**Attachment B**

**Affidavit**

Mark Hindle, being duly sworn, deposes and says:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") currently assigned to the Newark Division, Atlantic City Resident Agency ("ACRA"). I have been employed as a special agent with the FBI since May, 1999. Over the course of my career, I have conducted and participated in criminal investigations involving violations of the laws of the United States, including but not limited to fraud investigations, violent crime investigations, and narcotics investigations. The information contained herein is based upon my own investigation and the investigation of other federal law enforcement officers.

2. This Affidavit is submitted for the limited purpose of establishing probable cause to support the issuance of a criminal complaint charging Patrick Giblin with wire fraud in violation of 18 U.S.C. § 1343. Therefore, I have not included each and every fact known to me concerning this investigation. I am thoroughly familiar with the information contained in this Affidavit based upon my own participation in this investigation, the information that I have learned from other law enforcement officers who have participated in the investigation, my discussions with them and other witnesses, and my review of documents and other items. When statements are recounted in this Affidavit, they are set forth in sum and substance unless otherwise indicated.

**Patrick Giblin's 2006 Convictions and the Previous Scheme to Defraud Women**

3. On or about March 3, 2005, Patrick Giblin was charged in a one-count criminal complaint in the District of New Jersey with extortion in violation of 18 U.S.C. §§ 1951(a) and 2 (Mag. No. 05-1032 (AMD)). Following Giblin's arrest, subsequent investigation conducted by

2

the FBI revealed that Giblin used telephone dating services to target women nationwide from at least January 2000 to March 2005. Giblin created numerous accounts in his name and was a patron of telephone dating services such as Quest Personals and Lavalife. With these dating services, Giblin had accounts with their local sites/chat lines in various cities around the country. Giblin maintained notebooks in which he kept notes of his activity on the telephone dating services. Giblin categorized his notes by city and kept notes on the specific women that he either contacted or intended to contact including such things as the woman's name, phone number, physical description, employment, and the type of person with whom the woman was seeking a relationship.

4.  The investigation revealed that Giblin contacted women who he identified on the chat lines. Giblin targeted single, vulnerable women, including women with physical disabilities, widows, and single mothers, including at least one who had recently lost a child. Giblin falsely professed an interest in a romantic relationship with these women. Giblin lied to the women about his background and typically claimed that he would be relocating to their region and that he needed a loan for travel expenses. The FBI interviewed numerous women who were contacted by Giblin. The interviews revealed that women throughout the country wired money to Giblin based on his false representations and promises. Western Union and MoneyGram also provided records, which confirmed that Giblin received large sums of money from women throughout the country.

5.  On May 12, 2006, Giblin pled guilty to Counts One through Ten of a Second Superseding Indictment, Criminal No. 05-439 (RBK), filed in the District of New Jersey, each of which charged him with wire fraud in violation of 18 U.S.C. §§ 1343 and 2. As part of Giblin's plea agreement, Giblin admitted that the loss associated with the case was greater than $200,000

3

but less than $400,000. Giblin further agreed that the offense involved more than 50 victims but less than 250 victims. On April 17, 2007, the Honorable Robert B. Kugler sentenced Giblin to a term of imprisonment of 60 months on Count One and a term of 115 months' imprisonment on Counts Two through Ten, all to be served concurrently.

**Escape from a Halfway House and the Initiation of the Current Scheme to Defraud Women**

6.  On December 5, 2012, Patrick Giblin arrived at the Luzerne Residential Re-entry Center ("RRC"), Philadelphia, Pennsylvania, as an institution transfer from the Federal Correctional Institution, Greenville, Illinois. According to information received from the Bureau of Prisons, Giblin signed out of the RRC on January 18, 2013 at approximately 8:30 a.m. on a job pass to seek employment in Atlantic City, New Jersey. Giblin was scheduled to return to the RRC by 8:30 p.m. Giblin failed to return and was determined to be in escape status. The matter was referred to the United States Marshals Service ("USMS"), for the purpose of locating Giblin, and he was subsequently entered into the National Computer Information Center database as a wanted person for escape.

7.  On or about February 5, 2013, law enforcement officers with the USMS located Giblin at the Rodeway Inn in Atlantic City and took him into custody following his escape from the RRC. Giblin had checked into the Rodeway Inn under the alias, "Michael Patrick." The FBI Agent, who was also involved as a case agent in the investigation that led to Giblin's previous conviction in the District of New Jersey (Crim. No. 05-439), arrived and advised Giblin of his Miranda rights. Giblin acknowledged those rights by nodding his head. The agent asked Giblin if he wanted to speak with the agent and Giblin responded, "What can I say, I walked away from the half-way house." The agent asked Giblin, who was in possession of $711, where he had been getting his money. He replied that he was being helped out by a friend and that he

4

took money provided to him by that individual, gambled with it, and won additional funds. The agent asked Giblin if he had been receiving money from any women. In response, he stated, "there's one chick I have been fucking around with." Giblin made additional unsolicited statements to USMS personnel.

8. On February 5, 2013, law enforcement officers executed a search warrant at 3601 Pacific Avenue (the Rodeway Inn), Room 106, Atlantic City, New Jersey, which was the room where Giblin had been staying. During the execution of the search warrant, law enforcement officers recovered various items including a cellular telephone, money transfer receipts, an address book, and notebooks. Law enforcement officers have had an opportunity to examine the notebooks recovered during the execution of the search. The notebooks contained a series of phone numbers from telephone dating chat lines in various cities throughout the United States, including Quest Personals, Lavalife, and the Night Exchange. The notebooks also contained descriptions of women who Giblin appeared to have contacted or interacted with over the chat lines following his arrival at the RRC, including physical descriptions and information about their interests and hobbies. Based on Giblin's notes, it appeared that the women lived throughout the United States including in Wisconsin, Minnesota, South Carolina, New York, and Ohio. In his notes about one woman, Giblin wrote "has a savings Account. Home is paid for not a golddigger (SIC)."

9. On March 20, 2013, following Giblin's return to custody, a federal grand jury sitting in the Eastern District of Pennsylvania returned a one-count Indictment charging Giblin with escape, in violation of 18 U.S.C. § 751(a). On May 14, 2013, Giblin pled guilty to this charge. On September 9, 2013, the sentencing judge sentenced Giblin to a term of imprisonment of 18 months.

## Commencement of Federal Supervised Release and Continuation of the Scheme to Defraud Women

10. The Federal Bureau of Prisons released Giblin on or about December 9, 2013 and he commenced his term of supervised release in the District of New Jersey. Giblin's conditions of supervision required, among other things, that he notify the probation officer within seventy-two hours of any change in residence or employment, and that he not leave the District of New Jersey without the permission of the Court or his Probation Officer.

11. An analysis of records provided by Global Cash Card revealed that Giblin began using a Global Cash Card[1] which he opened in his name in New York beginning on or about October 24, 2014. Prior to that date, Giblin had been using the card in the Atlantic City, New Jersey area. Giblin never received permission from the Court or Probation Office to leave the State of New Jersey.

12. On December 16, 2014, the USMS arrested Giblin at the Scottish Inn, Room 202, 1384 Central Avenue, Colonie, New York. According to records at the Scottish Inn, Giblin checked into Room 202 on or about October 23, 2014. According to the Registration Card at the Scottish Inn, which Giblin signed, he provided his name as "Patrick Giblin" and 600 East Luzerne Street, Philadelphia, Pennsylvania as his address. Giblin had been paying for his room in cash.

13. Giblin was charged in an Amended Petition for Warrant or Summons for Offender Under Supervision with violating the conditions of his supervised release, and he was

---

[1] A Global Cash Card is essentially a reloadable debit card which can be used to pay for goods and services provided by companies and retailers that accept payments by credit and debit card.

6

sentenced on October 2, 2015 to 24 months' imprisonment and one additional year of supervised release. Giblin is currently in federal custody serving this sentence.

### Use of Telephone Dating Services to Advance the Scheme to Defraud and Captured Recordings

14. During the course of the current investigation (December 2012 through December 2014), the Government received records from telephone dating services utilized by Giblin to carry out his fraudulent scheme, including records documenting telephone numbers associated with Giblin dialing into the dating services (including the number he provided his federal Probation Officer) and copies of dozens of audio recordings that Giblin had placed on the Quest and Lavalife systems throughout the United States. During the scheme, Giblin posted personal ads/messages on these telephone dating services, wherein he made false representations and statements to induce women to send him money including, but not limited to:

   a. Giblin claimed that he had moved or was moving to the location, outside the state of New Jersey, where he placed/posted the ad/message representing that he was looking for "one real, true, genuine woman" who was seeking a "long-term, committed relationship";

   b. Giblin claimed that he was working for "the State Lottery Commission" or in the casino business in the state to which he represented he was moving;

   c. Giblin claimed that he owned ocean front property in Atlantic City, New Jersey;

   d. Giblin claimed that had access to discount flights on U.S. Airways for himself and a companion because his brother was an executive with U.S. Airways; and

   e. Giblin claimed that he would not judge a woman based on her weight or appearance and that what mattered to him was "personality" and "most importantly what is on the inside."

7

Based on my education, training and experience, and what I have learned from my participation in this investigation and from other agents involves with this investigation, Giblin used these false representations and other false representations to contact women all over the country in an effort to falsely lure these women into believing that Giblin was moving to their area and was interested in developing a relationship. Giblin sought to lure these women by preying on their hope of developing a relationship so that he could induce them to send him money based on the false promise that he would pay them back. However, Giblin was either in escape status from a halfway house or on supervised release when he contacted these women. He never intended to move to their locations and he did not intend to develop a "long-term, committed relationship" with them. Moreover, Giblin was not permitted, as a term of his supervised release, to move to their locations. Additionally, Giblin did not work in the casino industry or with any state lotteries, he did not have access to discounted flights, and he did not own beachfront property in Atlantic City.

**Telephone Contact with Women, Fraudulent Representations, and Interstate Wires**

15. During the period of approximately December 2012 through December 2014, Giblin contacted telephone dating services in an attempt to lure and defraud women, as described in paragraph 14. Giblin also directly spoke with women who responded to him on the telephone dating lines. Giblin used false representations to induce these women to send him money. The victim women who did send money believed that Giblin would pay them back based on the representations that he made. Giblin received money from the victim women via interstate wire services such as Western Union and MoneyGram. Giblin would sometimes pick up money directly at a Western Union or MoneyGram terminal. In other situations, Giblin would direct the women to wire the money directly to his Global Cash Card account which would result in the

8

money being loaded on the card. Giblin then spent this money in New Jersey, and after on or about October 24, 2014, in New York. Giblin defrauded or attempted to defraud in excess of 20 women. A sampling of some of the women he defrauded and the corresponding wires is set forth below:

    a. **Victim #1**

Victim #1, at the time relevant to this Complaint, resided in Morris County, New Jersey. Victim #1 advised that she came into contact with "Pat," subsequently determined to be Giblin, through Lavalife Chat. Victim #1 stated that after making contact with Giblin, they soon began talking on the telephone. According to Victim #1, Giblin said that he had a house on the beach in Ventnor, New Jersey, his father was a judge, and he worked in a casino, but he was looking for a better job in another casino. Giblin also told Victim #1 that he did not care about a woman's weight; rather, he said he only cared about a woman's inner beauty.

According to Victim #1, shortly after she began talking to Giblin, he contacted her, said he had been travelling in Pennsylvania, that his car had broken down, and that he needed to borrow $300 for repairs. Giblin instructed Victim #1 how to wire money because she had never done this before. At Giblin's direction, on January 14, 2013, Victim #1 wired $300 by Western Union from Boonton, New Jersey to Giblin, who received the money in Philadelphia, Pennsylvania. Official records provided by Western Union confirmed this interstate wire.

Victim #1 advised that she provided Giblin money on two additional occasions on the condition that she would be repaid. Victim #1 wired Giblin $240 on or about January 16, 2013 from Boonton, New Jersey to Philadelphia, Pennsylvania and $300 on January 19, 2013 from Boonton, New Jersey to Atlantic City, New Jersey. Victim #1 believed that Giblin needed the $300 for some reason associated with Giblin getting a new job at a casino.

9

Giblin told Victim #1 on January 19, 2013 that he was travelling to see Victim #1 to repay the money that he borrowed. Giblin never arrived, and Victim #1 has not heard from him since. It should be noted that Giblin, under false presentences, received money from Victim #1 in the days leading up to his escape from the halfway house and shortly after he absconded from the halfway house. It should be further noted that Giblin's father was not a judge. Giblin never paid Victim #1 back.

    b. **Victim #2**

Victim #2, at the time relevant to this Complaint, resided in Delaware County, Pennsylvania. Victim #2 advised that she came into contact with "Pat," subsequently determined to be Giblin, on the Quest Chat line. Victim #2 and Giblin then began talking on the telephone. According to Victim #2, Giblin claimed he was single, worked at Caesars Casino, and that his father was a judge.

Victim #2 advised that Giblin asked to borrow money from her on several different occasions. Victim #2 advised that Giblin always promised to pay her back, and Victim #2 believed that he would. Victim #2 advised that Giblin asked to borrow money for a variety of reasons, including because he needed money to free up winnings he secured in a gambling tournament. Victim #2 said she never met Giblin. Victim #2 said she and Giblin were supposed to meet on several occasions, but Giblin always had an excuse. Victim #2 used MoneyGram to wire Giblin money from Pennsylvania to Atlantic City, New Jersey on at least four different occasions in the following amounts: (1) January 28, 2013 - $200; (2) January 31, 2013 - $250; (3) February 4, 2013 - $600 and (4) February 4, 2013 - $150. Official records received from MoneyGram confirmed these interstate wire transfers. Victim #2 also used Western Union on at

least one occasion (January 31, 2013) to send Giblin money ($95) from Pennsylvania to New Jersey.

Giblin never repaid Victim #2. It should be noted that Giblin had escaped from the halfway house in Philadelphia and was living in the Atlantic City, New Jersey area when he solicited and received money from Victim #2.

c. **Victim #3**

Victim #3, at all times relevant to this Complaint, resided in Fayette County, Pennsylvania. Victim #3 advised that she met "Pat," subsequently determined to be Giblin, on a telephone dating line and that they exchanged telephone numbers and soon began having telephone conversations. Giblin claimed that he was a bartender at a casino in New Jersey and that he was moving to Pennsylvania to work at a casino there. Giblin also claimed that his father was a judge and that his mother was very religious.

Victim #3 advised that around her third conversation with Giblin, he claimed he had a $350 car payment due and that he did not have the money to make the payment. Giblin asked Victim #3 if she could send him the money and he would pay her back. Victim #3 agreed to send Giblin $340, and he then directed her to send it via Western Union. Western Union money transfer records confirm a $340 wire on March 20, 2014 from Victim #3 in Pennsylvania to Giblin in Absecon, New Jersey.

Victim #3 advised that Giblin continued to ask her to loan him money, and between March 22, 2014 and May 5, 2014, Victim #3 sent Giblin approximately eight additional, separate interstate wire transfers, all of which were received in New Jersey and which totaled approximately $2,270. Victim #3 advised that Giblin always called her from different telephone numbers. Victim #3 stated that Giblin often spoke to her about getting together and meeting in

11

person, and he even alleged that he attempted to drive and see her, but he claimed that he had problems with his tires and he got lost. Victim #3 stated that she told Giblin early on that she received a social security disability check each month.

Victim #3 advised that she has never been paid back. Victim #3 stated that she reported Giblin's fraud to the Pennsylvania State Police.

   d. **Victim #4**

Victim #4, at all times relevant to this Complaint, resided in Caroline County, Virginia. Victim #4 advised that in late June or early July 2014, she met Giblin on a telephone chat line. Giblin stated that he was a dealer at a casino, that he lived close to but outside of Atlantic City, that he was being transferred to the Richmond, Virginia area, and that he wanted to get together with Victim #4. Giblin soon began asking to borrow money from Victim #4

Victim #4 recalled that she sent Giblin money on four occasions totaling $860. She recalled that Giblin first asked for a loan of $250 to $300 to help him move to Richmond. Victim #4 advised that she only had $170, and she sent it to him on August 1, 2014. Western Union records confirm that Victim #4 wired Giblin $170 from Virginia to Egg Harbor City, New Jersey on this date. Shortly thereafter, Giblin asked for more money because he reportedly was being "shaken down" by the movers. Western Union records confirmed that Victim #4 wired Giblin $190 from Virginia to Egg Harbor City on August 2, 2014. Victim #4 next advised that Giblin asked her to loan him money so he could drive himself to Richmond. Western Union records confirmed that Victim #4 wired Giblin $250 from Virginia to Atlantic City on August 5, 2014.

Victim #4 stated that after the $250 transfer, she waited for Giblin to arrive in Virginia and meet with her, but instead she received a text message from Giblin claiming that he

12

had been pulled over by the Virginia State Police and that his car was impounded. Giblin requested that Victim #4 contact his father who was a judge, but Victim #4 stated that the number Giblin provided her was not valid. Giblin eventually called her again and stated that he was out of jail and asked for more money to get his car released so he could finish driving to Richmond. Giblin promised that once he got to Richmond, he would pay Victim #4 back all of the money. According to Western Union records, on August 8, 2014, Victim #4 wired Giblin another $250 from Virginia to Egg Harbor City, New Jersey. Again, Victim #4 waited for Giblin to arrive, but he never did. Giblin then claimed he had to go back to New Jersey to get his license straightened out, and he continued to request to borrow more money. Victim #4 did not send him more money.

Victim #4 advised that Giblin promised to pay her back and never did. Victim #4 also stated that Giblin tried to make her feel guilty for not sending him more money. Victim #4 advised that she last spoke to Giblin sometime in October 2014, and he hung up on her. Victim #4 advised that she had borrowed some of the money she sent to Giblin from her parents and that she was in danger of being evicted from the hotel where she was living. Victim #4 further advised that she had never sent money via Western Union before and that she did so at Giblin's direction. Victim #4 advised that she reported Giblin to the Caroline County Sheriff's Office. Victim #4 has not been paid back.

    e. **Victim #5**

Victim #5, at all times relevant to this complaint, resided in Clay County, Florida. Victim #5 stated that in approximately July 2014, she met Giblin on Quest chat service. She advised that they eventually exchanged telephone numbers and had numerous telephone conversations. According to Victim #5, Giblin claimed that was employed in the casino business

in New Jersey but was moving to Florida to start a job with the Florida State Lottery in Jacksonville.

Victim #5 stated that in late July or early August 2014, Giblin asked Victim #5 for a loan, which he claimed he would pay back the next day. Giblin claimed he was stuck at the airport in New Jersey on his way to Florida. Victim #5 stated that she wired Giblin money on two consecutive days, namely a $200 transfer and a $180 transfer. Western Union records confirm that Victim #5 did in fact wire $200 on August 12, 2014 and $180 on August 13, 2014 from Florida to Giblin in Egg Harbor City. When Giblin did not pay Victim #5 back, Victim #5 claimed that Giblin gave her excuses such as his debit cards were forwarded to his new P.O. Box in Jacksonville, that he did not have access to money, and that even though his family was wealthy, his father had cut off his access to money because he was mad that Giblin was moving to Florida.

Victim #5 stated that Giblin never paid her back, and that she last spoke to Giblin on the chat line during November or December 2014. She believed that Giblin backed off from her because she asked a lot of questions and she confronted him. Victim #5 also noted that Giblin would change his cell phone number regularly. It should be noted that Giblin told Victim #5 that he was moving to Florida at approximately the same time he told Victim #4 that he was moving to Virginia.

f. **Victim #6**

Victim #6, at all times relevant to this complaint, resided in Ontario, Canada, within driving distance of Erie, Pennsylvania. According to Victim #6, she was using Lavalife when she encountered a male she now knows to be Patrick Giblin. Giblin told Victim #6 that he was from New Jersey but he was going to be moving to Erie to take a job with the state lottery

14

commission. Giblin claimed his father was a judge, that his brother was an airline pilot for U.S. Air, and that he owned a five bedroom beach house in Atlantic City, New Jersey. Victim #6 advised that the conversation eventually became romantic in nature, and at one point, Giblin asked Victim #6 if she wanted him to come see her. Victim #6 offered to visit Giblin when he got to Erie.

Victim #6 claimed that Giblin told her that he had helped women in the past by sending money in times of need. Giblin asked Victim #6 if she would ever do something like that for a stranger. Victim #6 said it would depend on the situation. Victim #6 recalled this conversation taking place on August 14, 2014.

On August 15, 2014, Victim #6 claimed that Giblin told her he was moving to Erie the next morning. Giblin told her that he had hired movers and he claimed that the movers were charging him $1,000 but the fee would be reduced to $500 if he paid in cash. Giblin claimed that his ATM machine would only allow him to take out $500 a day and he had already done that. Giblin asked Victim #6 to lend him $500 to pay the movers. Giblin promised to pay her back and also give her an additional $250, which represented half of what he would save by paying cash for the movers. Giblin also promised to pay her three times what she spent on gas to drive to Erie to help him unpack.

Victim #6 advised she sent the money via Western Union. Western Union records confirmed a $415.36 international wire transfer from Canada to Giblin, in Egg Harbor City. It was at the time of the transfer that Victim #6 learned Giblin's full name. Victim #6 advised that she then researched Giblin's father and could find no record of him as a judge. However, she found information indicating that Giblin had defrauded other women in the past. According to Victim #6, Giblin contacted her again and claimed he was a big tipper and needed

15

an additional $150 to tip the movers. Victim #6 reported that Giblin "went off" when she did not send him more money and that he said she would receive the money back when he saw her that evening. Victim #6 never saw Giblin and never received her money back. It should be noted that during the approximate time Giblin told Victim #6 that he was moving to Erie, he also represented to Victim #5 that he was moving to Florida and Victim #4 that he was moving to Virginia.

g. **Victim #7**

Victim #7, at all times relevant to this Complaint, resided in Hillsborough County, Florida. Victim #7 advised that she met Patrick Giblin through QuestChat, a telephone service that allows a person to meet new people. Victim #7 explained that, after meeting Giblin through this service, Victim #7 and Giblin exchanged cellular telephone numbers and began conversing. According to Victim #7, Giblin claimed he was in the casino business in Atlantic City, that his father was a judge, that he was moving to Florida to take a position with the Florida Lottery Commission, and that he had a found a place to stay in Tampa and was currently in the process of packing up his household goods in order to move to Florida.

Victim #7 stated that during one of their conversations, Giblin claimed that he could save himself $700 on the cost of the move if he paid the movers in cash. Giblin complained that he was $400 short and asked Victim #7 is she could lend him the money. Victim #7 advised that she was reluctant to lend the money, but that she ultimately agreed. Victim #7 further advised that Giblin requested she wire him the money. Thereafter, Victim #7 used MoneyGram to wire Giblin $400 from Florida to Atlantic City on October 10, 2014. Victim #7 stated that a few hours after the transfer, Giblin contacted her again and requested additional money for travel expenses to get to Florida, which she also reluctantly sent. Victim #7

then used MoneyGram to wire Giblin $220 from Florida to Egg Harbor City on October 10, 2014 following the earlier wire that day.

Victim #7 stated that Giblin attempted to borrow more money from her. Victim #7 confronted Giblin, and he claimed he would pay her back in small increments because he was sick. Victim #7 recalled that during one of her final conversations with Giblin, he admitted to being a scammer and told her that he could not pay her back because he had spent the money at the casino. Giblin never paid Victim #7 back.

h. **Victim #8**

Victim #8, at all times relevant to this complaint, resided in Brown County, Wisconsin. Victim #8 encountered Giblin on Quest. Victim #8 recalled that on or about October 14, 2014, she spoke to Giblin. Giblin claimed he was originally from New Jersey but was moving to Wisconsin to take a job with the Wisconsin State Lottery. Giblin said his father was a judge, his mother was a socialite, and that he owned a five bedroom beach home. Giblin claimed that his brother was a pilot with U.S. Air and he had access to reduced airline fares. It was also during this call that Victim #8 recalled Giblin asking her if she would be willing to send him money if he was ever in a bind. Victim #8 also stated that she told Giblin that she was travelling with her son to a wedding in Pennsylvania in a couple days and would meet him there.

Victim #8 stated that the next day, Giblin called her and stated that his father had given him $500 to pay bills but he lost the money while jogging. Giblin claimed that he did not want to tell his father he lost the money, and he asked to borrow $175 from Victim #8. Giblin claimed that he had two friends who would lend him the rest. Victim #8 advised that, using MoneyGram, she deposited $175 into Giblin's Global Cash Card account. MoneyGram records confirmed the interstate wire transaction. Approximately two days later, Giblin contacted Victim

#8 again and claimed he needed an additional $200 to tune up his car, for food, and for his EZ Pass account. Victim #8 deposited $195 in Giblin's Global Cash Card account using MoneyGram, as confirmed by MoneyGram's official records. Giblin never came to see Victim #8, and never repaid her. According to Victim #8, Giblin tried to obtained additional money from her in early November 2014, but she refused to lend him more. Giblin used at least four different telephone numbers to communicate with Victim #8.

According to Global Cash Card records, Giblin received $175 on his card on October 15, 2014. He then withdrew $170 from an ATM machine using this card. According to Global Cash Card records, he received $195 on October 17, 2014. He then withdrew $200 from an ATM machine, which left him with a $1.46 balance. Giblin appeared to use this money to travel to New York because, as set forth in paragraph 12, he checked into the Scottish Inn in Colonie, New York on October 23, 2014.

16. Following his unlawful flight from the District of New Jersey, while on supervised release, Giblin continued to receive money, which was loaded via interstate wires into his Global Cash Card account, while he was in New York. Giblin utilized, in sum and substance, the same lies and false representations while in New York that he used in New Jersey. As set forth in paragraph 12, law enforcement arrested Giblin and took him into custody on or about December 16, 2014.

17. Based on the content of this affidavit, the Affiant respectfully submits that probable cause exists to support the issuance of a Complaint and arrest warrant for Patrick Giblin.